# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2721

_____

United States of America,      *
     *
         Appellee,      *
     *
       v.      *    Appeal from the United States
     *    District Court for the Eastern
Thomas Finley,      *    District of Missouri.
     *
         Appellant.      *

_____

Submitted: March 9, 1999

Filed: April 29, 1999

_____

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and SACHS,[1] District Judge.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Thomas Finley was indicted on three counts of using the mails with the intent that a murder-for-hire be committed in violation of the laws of Missouri. *See* 18 U.S.C. § 1958(a). He was convicted after a bench trial. On appeal, he maintains that there was insufficient evidence to convict him, that he was entrapped, and that the

_____

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, sitting by designation.

government engaged in such outrageous conduct in securing his conviction that the charges against him should have been dismissed.

We affirm the judgment of the trial court.[2]

I.

While in jail awaiting trial on a charge of rape, Mr. Finley asked his cellmate, James Stewart, whether Mr. Stewart's brother (who Mr. Finley believed was a murderer) could help him eliminate Rene Rowe, the supposed victim of the alleged rape. Mr. Stewart agreed with Mr. Finley that he would have his brother visit the jail disguised as a minister. Mr. Stewart then contacted the FBI, which arranged to have one of its agents enter the jail in clerical garb and speak privately with Mr. Finley. When the agent asked what he wanted done to Ms. Rowe and her boyfriend, Mr. Finley said, "Well, he [Mr. Stewart] mentioned whacking 'em ... yeah. Eliminate 'em." If Ms. Rowe persisted in going to trial, then, Mr. Finley said, "We'll make 'em disappear and I'll pay you for doing that." When the agent asked Mr. Finley directly whether he wanted him to kill Ms. Rowe and her boyfriend, Mr. Finley replied, "If that's what has to be done. If they don't, you know, come to reason."

After this conversation, Mr. Finley twice wrote to the address that the agent had given him and told him to "go ahead with the overdose or whatever as soon as possible," and said that he would pay the agent when he was released. (An overdose of drugs was one method that Mr. Finley had proposed for carrying out the murder of Ms. Rowe.) A third letter directed the agent to collect a ring worth $700 or $800 from Mr. Finley's sister as the equivalent of earnest money: "I want you to know I am sincere," the letter said. "I wanted to give you something to prove my good faith."

---

[2]The Honorable Stephen Nathaniel Limbaugh, United States District Judge for the Eastern District of Missouri.

This evidence, and other evidence that was adduced at trial, is more than ample to sustain Mr. Finley's conviction. First of all, since the letters arrived in the mail, and there was evidence that Mr. Finley put the stamps on them, a rational factfinder could conclude that he used the mails in the furtherance of his plan. Mr. Finley has an elaborate story that, if believed, would indicate that he had no intention to use the mails, and did not cause them to be used; but the trial court did not credit his story, and it was not required to. Second, Mr. Finley's reference to "whacking 'em," and his direction to "eliminate 'em," supports the conclusion that he wanted the witnesses killed, a manifest violation of Missouri law. Third, Mr. Finley promised to pay the FBI agent for his services, and arranged to have a ring given to him as the equivalent of earnest money. These are the three elements of the crime with which he was charged. *See* 18 U.S.C. § 1958(a).

Mr. Finley protests that his direction to kill the witnesses was conditioned on being unable to dissuade them from testifying. But even if a conditional scheme to murder is not punishable under the relevant statute, a question that we do not decide, the letters that Mr. Finley wrote after the meeting with the FBI agent contain unconditional directions to carry out an agreement to commit murder for hire.

## II.

Mr. Finley argues that, even if there is sufficient evidence in the record to support his conviction for the offense, he was entrapped into committing it. He asserts that it was Mr. Stewart's idea to contact Mr. Stewart's brother to murder the witnesses, and that Mr. Stewart was acting on behalf of the government at the time that he revealed his idea to Mr. Finley.

But, in the first place, the trial court believed Mr. Stewart's testimony that Mr. Finley, without any prompting, had requested him to arrange contact between his brother and Mr. Finley so that Mr. Finley could persuade the brother to kill the witnesses. That finding is not clearly erroneous, and it makes it clear that Mr. Finley

-3-

was predisposed to commit the crime, a fact immediately fatal to an entrapment defense. *See Jacobson v. United States*, 503 U.S. 540, 548-50, 553-54 (1992), and *Mathews v. United States*, 485 U.S. 58, 63 (1988). Mr. Finley's predisposition was manifest, and he was thus an " 'unwary criminal' " rather than an " 'unwary innocent,' " *United States v. Russell*, 411 U.S. 423, 436 (1973), quoting *Sherman v. United States*, 356 U.S. 369, 372 (1958).

The trial court also found, moreover, that Mr. Stewart was not acting as a government agent at the time of his initial conversation with Mr. Finley concerning the possibility of employing his brother to kill Ms. Rowe, a finding that the record abundantly supports. Therefore, even if Mr. Stewart had predisposed Mr. Finley to the commission of a criminal act, the entrapment defense would have been unavailable because Mr. Stewart's actions could not be imputed to the government.

III.

The final argument that Mr. Finley offers is that the charges against him should have been dismissed because the government engaged in outrageous conduct to secure his conviction. Outrageous conduct is a term of art: It means conduct "so outrageous and shocking that it exceed[s] the bounds of fundamental fairness." *United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir. 1985). The course of governmental conduct described earlier is hardly outrageous; in fact, it does not entail anything that is in any way atypical of what government does to detect and prevent crime on a daily basis. " 'Artifice and stratagem may be employed to catch those engaged in criminal enterprises.' " *Jacobson*, 503 U.S. at 548, quoting *Sorrells v. United States*, 287 U.S. 435, 441 (1932).

It is true that there was a second meeting between Mr. Finley and the FBI agent posing as a minister, in the course of which the agent told him falsely that he had contacted the witnesses and they had refused to agree not to testify. A lie might, under some circumstances, amount to governmental activity sufficiently

-4-

outrageous to void a conviction.  But in this case the offense was complete before the second meeting, because the three letters and the conversation that furnished the basis for the conviction were mailed and took place before the second conversation occurred.  That exchange is thus irrelevant to Mr. Finley's defense of outrageous conduct, and we therefore reject the defense.

## IV.

For the reasons indicated, we affirm the judgment of the trial court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.