REVISED February 23, 2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-40955

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DORA GARCIA CISNEROS,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Texas
_____

February 3, 2000

Before POLITZ, JOLLY, and DUHÉ, Circuit Judges.

ON PETITION FOR REHEARING & SUGGESTION FOR REHEARING EN BANC

The original opinion in this matter was issued by the panel on October 28, 1999. A petition for rehearing is currently pending before this panel. The petition for panel rehearing is granted to the extent that we VACATE our previous opinion and replace it with the following opinion. In all other respects, the petition for panel rehearing is DENIED.


OPINION

Before POLITZ, JOLLY, and DUHÉ, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Joey Fischer, a high school student, was murdered in cold blood by a hired killer--a killer hired by the mother of an erstwhile girlfriend.

Fischer and Christina Cisneros ("Christina"), were in high school in Brownsville, a Texas border town. They began dating in the spring of 1992. But Fischer ended the courtship after only several weeks to the bitter disappointment of the Cisneros family.

Dora Cisneros ("Cisneros"), Christina's mother, first tried to persuade Fischer to change his mind. Fischer was not interested. When this did not work, Cisneros went to a fortune teller named Maria Martinez to find out whether Fischer was destined to marry Christina. The tarot cards did not hold the answer she wanted, so Cisneros told Martinez to put a curse on the young man.

Near the end of October, Cisneros turned to a more mundane solution: she asked Martinez to find someone to beat up Fischer. By winter, Cisneros had decided to have him murdered instead.

Now enter Daniel Garza. Garza had also been unlucky at love. He and his wife separated in the spring of 1992. Soon afterwards, he came to Martinez, asking what he might do to rekindle the fire of romance with his wife. During one of their meetings in October 1992, Martinez's thoughts reverted to the lost romance of the scorned Christina. She asked Garza about finding someone to rough up Fischer. In late January or early February, however, Martinez

upped the ante with Garza: she relayed that "the client" wanted the boy killed.

Though Garza assured Martinez that he would find someone for the job, he was more immediately concerned with rejuvenating his own fast-fading love life. In the ensuing weeks, he frequently called Martinez to discuss schemes to get his wife to return. In the meantime, however, Martinez, was under almost daily pressure from Cisneros for news on the planned retribution against Fischer. Feeling the pressure, Martinez would interrupt Garza during their conversations to find out if he had found someone to kill Fischer. Garza lied several times and said he had found someone to commit the crime. The two would then discuss the murder before returning to the subject of a plan to plant the stirrings of love in the heart of Garza's wife.

There is an important--a highly important--question about where Garza placed these calls. At trial, he testified that he made at least four calls from two Mexican towns, San Fernando and Matamoros. He said that he had placed them in "casetas," booths where a caller pays for the call after making it. During cross-examination, however, defense counsel asked him why an FBI report from his interview with an agent said that he had made the calls collect. Garza testified that the agent was mistaken. Garza went on to explain that collect calls from Mexico were difficult, though he may have made one of them to Martinez. In its case-in-chief,

3

the defense tried to show that no calls were made from Mexico. FBI Agent David Church was called as a defense witness. He testified that while Garza had told him that all the calls were collect, Martinez's phone records did not show any such calls.

In early February 1993, Garza found the men to kill Fischer: Israel Olivarez and Heriberto "Eddie" Pizana. He met them in Brownsville, at the home of Olivarez's uncle. Like Garza, they worked for Rudy Cuellar in a drug smuggling and auto theft operation stretching from Mexico to Chicago. Olivarez and Pizana were car thieves and hit men for the organization. Garza met with the two again in Dallas on February 14 to explain what he wanted. Olivarez said that they would commit the crime the next time they were in Brownsville. Garza gave them a photo of Fischer and a map to his house.

On the afternoon of March 2, Garza was returning from San Fernando, Mexico, to San Antonio, Texas. He stopped at the La Quinta Inn in Brownsville, where he happened to find Olivarez. Olivarez told him that "he was ready to do the job."

We now turn to a development of uncertain connection to the hired killers, but one that we must mention. At 6:39 that evening, a car crossed into the United States from Mexico at the Brownsville point of entry. Border authorities recorded its Mexican license plate number as "821 THE7." A vehicle with that plate had crossed the border eighteen times between August 1992 and March 1993. At

8:26 p.m., Pizana and Ramon Palomares, another Cuellar hit man, checked into the La Quinta Inn. The receptionist registered their car as a white Grand Marquis with Mexican plates. Her handwriting made it hard to decipher whether the plate number was "821 TWEX" or "821 THE7."

We now come to the implementation of this insane and tragic scheme. A little after 7:00 a.m. on March 3, Fischer was shot and killed in his driveway. The physical evidence consisted of a bail bondsman's business card found next to the body and a tennis shoeprint on the outside air conditioning unit. The only other clue to the killer's identity was a witness who remembered passing a four-door white car with Mexican plates driving in the vicinity of Fischer's house near the time of the murder. The witness described the man in the car as Hispanic, twenty-three to twenty-five years old, with a short beard.

Then the conspirators spread the news that the deed was done. Between 7:00 and 8:00 the morning of the murder, Olivarez called Garza to tell him that Fischer was dead. Garza immediately relayed this news to Martinez, who said that she could not get the money from her client without proof of the murder. Garza then discussed the situation with Olivarez at the La Quinta Inn. Pizana was also in the room, but not Palomares. After the discussion, Pizana and Garza visited Martinez, who gave them the money. When the two returned to the La Quinta, Garza tried to give Pizana the money,

5

but he declined and told Garza to give it directly to Olivarez. Garza did that and noticed before leaving that Olivarez and Pizana had two white vehicles: a white pickup truck with a black stripe and a white Ford.

Fortunately, the bondsman's business card had handwriting on the back, and it matched Cuellar's handwritten bond application. They also began pursuing information on Cuellar's associates, Pizana, Olivarez, and Ramiro Moya. They learned about Garza through Moya, Garza's brother.

Garza became the key that opened the gate through which other conspirators were herded. He agreed to set up a meeting with Martinez and to wear a wire. He called her twice to tell her that the gunmen wanted more money, and each time she gave it to him. The police then arrested Martinez and had her wear a wire for a meeting with Cisneros. They arrested Cisneros in her car as she was giving Martinez $500.

At trial, testimony by a person working for Cuellar, Victor Moreno, helped establish the link between Cuellar and the murder. Moreno testified that he heard about the Fischer murder within the Cuellar organization. He had also been with Cuellar when Palomares phoned Cuellar to report the murder of "a boy" in Brownsville.

Cisneros and her accomplices were convicted in state court for capital murder. The Texas appellate court overturned the conviction, however, for insufficiency of evidence linking her to

the murder.  The state then turned the case over to federal prosecutors, who charged Cisneros under the federal murder-for-hire statute, 18 U.S.C. § 1958.  She was convicted in May 1998.  The district court then denied her motion for judgment notwithstanding the verdict and for a new trial.  Cisneros has now appealed, citing seven different instances of insufficient evidence and error.

I

A

The first, and most complex, issue that this case presents is whether there is sufficient evidence to show that Cisneros met the interstate/foreign commerce requirement for a federal murder-for-hire conviction.  In 1993,[1] the relevant parts of the statute read:

> (a) <u>Whoever</u> travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or <u>uses or causes another</u> (including the intended victim) <u>to use</u> the mail or <u>any facility in</u> interstate or <u>foreign commerce, with intent that a murder be committed</u> in violation of the laws of any State or the United States <u>as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value</u>, shall be fined not more than $10,000 or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined not more than $20,000 and imprisoned for not more than twenty years, or both; and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both.
> (b) <u>As used in this section and section 1959</u> . . .

---

[1] The murder occurred in 1993.  In 1994, the statute was amended to allow for capital punishment when death resulted from a murder-for-hire.  Pub.L. 103-322, § 60003(a)(11), 108 Stat. 1969, 2033 (1994).

7

> (2) "<u>facility of interstate commerce</u>" includes means of transportation and communication.

18 U.S.C. § 1958 (emphasis added). The government asserts that it proved this interstate/foreign commerce requirement in two ways, either of which was sufficient. First, Garza's phone calls from Mexico to Martinez in Brownsville qualify as use of a "facility in interstate or foreign commerce" caused by Cisneros. Second, the matching license plate numbers from the vehicle that crossed into the United States from Mexico and was later registered at the La Quinta Inn to Pizana and Palomares, combined with the sighting of a white vehicle near the scene of the crime, demonstrates that Cisneros caused another to travel in foreign commerce.

B

To determine whether the government presented evidence sufficient to satisfy this element, we first need to determine what the statute requires. Section (a), in setting out the crime, uses the term "facility <u>in</u> interstate or foreign commerce." Section (b), however, confusingly defines "facility <u>of</u> interstate commerce" for sections 1958 and 1959 and includes "means of transportation and communication" in that definition. 18 U.S.C. § 1958. Since neither section uses the term "facility <u>of</u> interstate commerce,"

8

the question is whether the broad definition in (b) should apply to "facility <u>in</u> interstate or foreign commerce" in (a).[2]

This distinction is important.[3] In this context, "of" means "[b]elonging or connected to," while "in" means "[d]uring the act or process of." <u>Webster's II New College Dictionary</u> 557, 759 (Houghton Mifflin Co. 1995). Under the term in (a), the use of the facility must have been in the process of interstate or foreign commerce. That would require us to undertake a fact-intensive inquiry to establish the interstate or foreign character of the instant use. If the definition in (b) applies, however, the statute would encompass even intrastate use of telephones or

---

[2]We observe that (b) does not include foreign commerce in its definition. We treat this as an oversight, inasmuch as there is no discernible reason for its omission, if (b) is intended to explain the substantive provisions in (a).

It also appears obvious that Congress made a mistake in mixing the terms "of" and "in," but it is not obvious which term reflects congressional intent.

[3]We disagree with the approach taken in <u>United States v. Coates</u>, 949 F.2d 104, 105 (4th Cir. 1991), which ignored the difference in the statute's language between (a) and (b). The breadth of this statute and its sister statute, § 1952, is the subject of an ongoing debate among the circuit and district courts. <u>See</u>, <u>e.g.</u>, <u>United States v. Heacock</u>, 31 F.3d 249, 254-55 (5th Cir. 1994)(any use of the mails qualifies); <u>United States v. Barry</u>, 888 F.2d 1092, 1095-97 (6th Cir. 1989)(requiring interstate use of the mail); <u>United States v. Riccardelli</u>, 794 F.2d 829, 830-34 (2d Cir. 1986)(any use of the mails qualifies); <u>Krantz v. United States</u>, 1999 WL 557524 at *3-7 (E.D.N.Y. 1999)(any use of mails qualifies); <u>United States v. Paredes</u>, 950 F.Supp. 584, 585-90 (S.D.N.Y. 1996)(requiring interstate use of pagers).

vehicles, since those are items connected to interstate commerce.[4]

[4]Existing case law establishes that telephones and automobiles are instrumentalities _of_ interstate commerce even when used solely for intrastate purposes.  See United States v. Hickman, 179 F.3d 230, 232 (5th Cir. 1999)(holding that a car is an instrumentality of interstate commerce); Dupuy v. Dupuy, 511 F.2d 641, 644-45 (5th Cir. 1975)(holding that intrastate use of phones qualifies as use of an instrumentality of interstate commerce);  United States v. Gilbert, 1999 WL 397424 at *6 (1st Cir. 1999)(holding that a telephone is an instrumentality of interstate commerce, regardless of whether it is used in an interstate manner); United States v. Weathers, 169 F.3d 336, 341 (6th Cir. 1999)(intrastate telephone calls qualify as use of instrumentality of interstate commerce); United States v. Cobb, 144 F.3d 319, 322 (4th Cir. 1998)(automobiles qualify as instrumentalities of interstate commerce); United States v. Randolph, 93 F.3d 656, 660 (9th Cir. 1996)("[C]ars are themselves instrumentalities of interstate commerce.").

Of course, these cases all refer to "instrumentalities," not "facilities."  The case law is less clear when dealing with statutes referring to "facilities of interstate commerce."  Some cases seem to find that any use of a phone or car is enough without discussing its intrastate or interstate character.  See, e.g., Mountaire Feeds, Inc. v. Agro Impex, S.A., 677 F.2d 651, 655 (8th Cir. 1982)(seemingly including any use of telephone); United States v. Goldfarb, 643 F.2d 422, 426 (6th Cir. 1981)(interpreting the Travel Act).  Others seem to require interstate or foreign use of such a facility.  See, e.g., Mendendez v. United States, 393 F.2d 312, 314 (5th Cir. 1968)(emphasizing that use of phone was "long distance"); United States v. Markiewicz, 978 F.2d 786, 814 (2d Cir. 1992)(emphasizing that the phone call was international); United States v. Smith, 789 F.2d 196, 203 (3d Cir. 1986)(requiring interstate travel).

We believe, however, that the important distinction is between the use of "of" and "in," not between "instrumentality" and "facility."  The Sixth Circuit analyzed this statute and reached the same conclusion.  United States v. Weathers, 169 F.3d 336, 341-42 (6th Cir. 1999).  Our own circuit has not been bereft of discussions on the subject.  See United States v. Miles, 122 F.3d 235, 246 (5th Cir. 1997)(DeMoss, J., concurring)(distinguishing between "of" and "in" interstate commerce).  A "facility of interstate commerce" is one by which interstate commerce is typically accomplished, regardless of its use in a particular instance.  Use of a "facility in interstate commerce," on the other hand, indicates that the facility is "in" interstate commerce when

Both theories that the government presented to show how Cisneros's murder-for-hire satisfied the foreign commerce requirement, therefore, would easily qualify under the statute. Cisneros's plan obviously caused people to use both telephones and automobiles.

We begin statutory construction with an examination of the statute's language. United States v. Alvarez-Sanchez, 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). There are two parts to 18 U.S.C. § 1958, the substantive portion setting out the criminal act, (a); and (b), the portion providing definitions for the terms used in (a). Oddly, part (b) defines a term that is not found in subpart (a). Reading the statute literally, almost mathematically, we would disregard the "irrelevant" definition and apply the substantive portion, (a), alone.

But this rigid approach glosses over the ambiguity that does exist, the seemingly superfluous definition. The canons of construction do not help. We recognize that in reading a statute, every word should be given significance. United States v. Nordic Village, Inc., 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). But this gets us nowhere. The canon obviously counsels against ignoring the definition in (b). If we use (b)'s broad definition to interpret "facility in interstate commerce," however,

_____

it is being used in the particular instance; in other words, a facility "in" interstate commerce has a temporal element or requirement that a facility "of" interstate commerce lacks.

11

then the portion of (a) dealing with interstate and foreign travel would be rendered superfluous. Use of a "means of transportation" would cover any type of travel as well. The application of this canon, therefore, does not resolve our statutory quandary.

Another potential guide for us is case law interpreting the Travel Act, 18 U.S.C. § 1952. We have previously held that reviewing section 1958 in the light of section 1952 is appropriate, since section 1958 follows section 1952's format and was intended as its supplement. United States v. Edelman, 873 F.2d 791, 794 (5th Cir. 1989). It is, therefore, potentially relevant that our circuit construed the Travel Act to include intrastate mailing. See United States v. Heacock, 31 F.3d 249, 254-55 (5th Cir. 1994)(construing the Travel Act to include intrastate mailing).

We conclude, however, that our interpretation of the Travel Act in Heacock is inapplicable here. Heacock concerned an interpretation of the Travel Act as it read in 1988. At that time, the relevant portion read: "Whoever . . . uses any facility in interstate or foreign commerce, including the mail." Id. at 254.

A circuit split had developed between the Sixth and Second Circuits concerning whether purely intrastate use of the mails qualified under this portion of the statute. See United States v. Barry, 888 F.2d 1092, 1095 (6th Cir. 1989)(requiring interstate use of mail); United States v. Riccardelli, 794 F.2d 829, 831-33 (2d Cir. 1986)(intrastate use of the mail would qualify). The Sixth

12

Circuit had held in Barry that the statute applied to facilities, including the mail, that were being used in interstate or foreign commerce. Barry, 888 F.2d at 1095. Thus, intrastate use of the mail would not fall within the statute's domain. In Riccardelli, on the other hand, the Second Circuit had held that "mail" in "including the mail" referred to the entire preceding clause, "facilit[ies] in interstate or foreign commerce." In other words, according to that court, the statute made clear that the mail was to be treated as distinct from all other facilities; that is, as a facility inherently "in interstate or foreign commerce."

The Second Circuit's treatment of the mails as distinct from all other facilities under the Travel Act was based on a thorough analysis of the statute and the history of the postal service. As the court explained, the U.S. Constitution specifically granted Congress the power to establish the postal service. U.S. Const. art. I § 8 cl. 7. From the presidency of James Monroe until the 1970 reorganization under President Nixon, the postal service was its own executive department, after which it became a government-owned corporation. Riccardelli, 794 F.2d at 831.

In Heacock, we examined this split and sided with the Second Circuit. The special character of the mail automatically made it a "facility in interstate commerce." Heacock, 31 F.3d at 255.

In 1990, Congress amended the Travel Act in a manner consistent with this interpretation. The heading to the relevant

13

section read "CLARIFICATION OF APPLICABILITY OF 18 U.S.C. 1952 TO ALL MAILINGS IN FURTHERANCE OF UNLAWFUL ACTIVITY." Act of Nov. 29, 1990, Pub. L. No. 101-647, § 1604, 1990 U.S.C.C.A.N. (104 Stat. 4843)(to be codified at 18 U.S.C. § 1952). The new language read: "Whoever . . . uses the mail <u>or</u> any facility in interstate or foreign commerce." 18 U.S.C. § 1952 (emphasis added). This was the version of the Travel Act that the federal murder-for-hire statute was to supplement and from which the drafters of 18 U.S.C. § 1958 drew their language.

Thus, it is clear that our <u>Heacock</u> analysis is limited to use of the mail, especially after Congress' 1990 amendment, because the mail is unique. It is plainly and unmistakenly treated separately from all other "facilities."

Ultimately, <u>Heacock</u> and other cases interpreting the Travel Act are not helpful to our inquiry because they do not face the same contradictory statutory language that we do today in the murder-for-hire statute. In construing the Travel Act, one need not wrestle with the distinctions and differing implications between "of" and "in." But we cannot avoid confronting them. Each term leads to a different result; the telephone used in making an in-state call is not one actually engaged in interstate or foreign commerce with respect to the particular use at issue, even though

14

the telephone is itself a facility *of* interstate or foreign commerce.

We next turn to the legislative history of 18 U.S.C. § 1958, which finally provides some helpful guidance.  The Senate Judiciary Committee's report on the bill supports a narrow reading of the statute in the interest of comity:

> The committee is aware of the concerns of local prosecutors with respect to the creation of concurrent federal jurisdiction in an area, namely murder cases, which has heretofore been the almost exclusive responsibility of state and local authorities. . . . This does not mean, nor does the committee intend, that all or even most such offenses should become matters of federal responsibility.

S. Rep. No. 225, 98th Cong., 1st Sess. 1983, 1984 U.S.C.C.A.N. 3182, 3484.

This legislative history plainly suggests that we should eschew the broader reading of the statute.  Using the definition in (b) to interpret "facility in interstate commerce" would extend the reach of the federal murder-for-hire statute to new realms of traditionally-exclusive state jurisdiction.  It is difficult to imagine a murder-for-hire scheme that would not involve the use of a telephone or an automobile.  This definition, therefore, would markedly increase criminal liability in this area.  The narrower interpretation of the statute, which applies the substantive part of the statute in (a), appears to be the appropriate one to use.

15

Because we are reluctant to rely solely on legislative history to eliminate ambiguity, however, we also look to the quasi-constitutional rule of lenity, which counsels us to resolve ambiguity in criminal statutes by construing them narrowly. The rule of lenity fosters the fundamental principle of due process:

> This practice [of resolving questions of the ambit of criminal statutes in favor of lenity] reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited.

Dunn v. United States, 442 U.S. 100, 112, 99 S.Ct. 2190, 60 L.Ed.2d 743, (1979). Its propriety was recently reaffirmed by the Supreme Court in United States v. Granderson, 511 U.S. 39, 54, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994). The rule of lenity also supports a narrow interpretation of this statute rather than the imposition of potentially-unanticipated federal criminal liability.

Finally, this narrow interpretation accords with the Sixth Circuit's decision in United States v. Weathers, 169 F.3d 336, 342 (6th Cir. 1999). That court ignored the definition in (b) because "the key prohibition creating the criminal offense is found in subsection (a)." We agree.

16

In reviewing its sufficiency, we view the evidence in the light most favorable to the verdict and affirm if a rational trier of fact could find that the government proved all essential elements beyond a reasonable doubt. United States v. Grossman, 117 F.3d 255, 258 (5th Cir. 1997). The government's proof need not exclude every reasonable hypothesis of innocence. United States v. Haas, 171 F.3d 259, 265 (5th Cir. 1999).

Though the interstate/foreign commerce requirement in 18 U.S.C. § 1958 is jurisdictional, United States v. Edelman, 873 F.2d 791, 794-95 (5th Cir. 1989), it is also an element of the offense. United States v. Feola, 420 U.S. 671, 677 n.9, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). This circuit does require proof beyond a reasonable doubt of interstate/foreign commerce. See, e.g., United States v. Thompson, 130 F.3d 676, (5th Cir.), cert. denied, 118 S.Ct. 2307 (1998)(using beyond reasonable doubt standard).

Labeling this requirement "jurisdictional," however, does eliminate the need to prove scienter of that element. United States v. Razo-Leora, 961 F.2d 1140, 1148 (5th Cir. 1992). It is enough that the proof showed interstate or foreign commerce in the commission of the offense and that Cisneros had knowledge of the nature of the offense that she promoted. Edelman, 873 F.2d at 795. The government did not need to establish that Cisneros intended to

cause interstate/foreign commerce or even that she knew it occurred.  Id.

D

The government did present sufficient evidence for a rational juror to conclude that Garza made international calls in arranging the murder-for-hire for Cisneros.  Garza testified that from late 1992 until early 1993, he called Martinez four times from Mexico, twice from San Fernando, and twice from Matamoros.  He explained that he made the calls from casetas and paid for them immediately afterwards because collect calls from Mexico were difficult to make.

During the calls, Garza would attempt to discuss his marital problems, but Martinez would interrupt and ask whether he had found someone to kill "the boy" for "her client."  Although Garza initially lied to her about finding "men to do the job," the urgency of Martinez's demands did not diminish.  During each of Garza's calls, Martinez continued to press him to find assassins for "her client."

Cisneros makes two arguments in response.  First, she contends that Garza's testimony about the Mexico calls lacks corroboration and contradicts Church's FBI report and testimony.  It is true that Church's report and testimony indicate that he believed Garza told him the calls from Mexico to Martinez were collect, and that

18

Martinez's phone records did not show any such calls. Garza, furthermore lacked any receipts proving they occurred.

The government's evidence, however, was nevertheless sufficient to prove the international phone calls. Credibility determinations are the exclusive province of the jury, United States v. Ruiz, 987 F.2d 243, 250 (5th Cir. 1993), and the jury is entitled to choose among reasonable constructions of the evidence. United States v. Thompson, 130 F.3d 676, 685-86 (5th Cir. 1997). As already explained, we read that evidence in the light most favorable to the jury verdict. Grossman, 117 F.3d at 258.[5] Here, Garza provided a reasonable explanation for why the calls were not collect. Given his language difficulties, some confusion during the interview with Church would be expected. Finally, Garza's lack of a receipt for these calls five years, or even five minutes, after they were made is not surprising. The conclusion that the calls were made, therefore, is legally supportable. It is not our province to become embroiled in a credibility debate between Church and Garza.

Second, Cisneros contends that the evidence did not establish that the international calls were "in furtherance" of the murder-

---

[5]This is true even when the jury reaches a general verdict based on two alternative theories. See Griffin v. United States, 502 U.S. 46, 49-51, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)(holding the jury verdict valid in this situation); United States v. Powers, 168 F.3d 741, 746 (5th Cir. 1999)(evaluating sufficiency of the evidence with deference).

for-hire. In other words, Cisneros argues that there was not a sufficient nexus between the foreign telephone calls and the murder scheme to violate the federal murder-for-hire statute.[6] She draws the support for her argument from the First Circuit's decision in United States v. Houlihan, 92 F.3d 1271, 1292 (1st Cir. 1996), where the First Circuit panel required the use of the facility in interstate commerce to be "in furtherance" of the underlying murder scheme. That is not the standard our circuit uses, however. In cases examining the nexus requirement in the context of the Travel Act, we merely require that the use of the facility in interstate or foreign commerce--here, the telephone--"facilitated" the underlying crime or "made it easier." United States v. Garrett, 716 F.2d 257, 266 (5th Cir. 1983), United States v. Pecora, 693 F.2d 421, 424 (5th Cir. 1982), and United States v. Perrin, 580 F.2d 730, 736 (5th Cir. 1978). There is no reason that the nexus requirement for § 1958 should be any different.

When we consider Cisneros's argument challenging the sufficiency of the evidence based on the appropriate standard, it does not succeed. There was sufficient evidence to establish a sufficient nexus between the use of the facility in foreign

---

[6]There was some confusion in Cisneros's original brief about whether "in furtherance" related to causation, intent, or to the nexus between use of the facility and the underlying crime. Cisneros only clarified this argument in her motion for rehearing. As we now understand it, "in furtherance" refers to the nexus between the crime and the use of the facility in foreign commerce.

20

commerce and the murder scheme because the telephone calls unquestionably facilitated in arranging the murder. Without Martinez's incessant reminders during those calls, it is reasonable for a jury to have believed that Garza would not have made as serious an effort to find a hit man. In this respect, the nexus here is at least as strong as those in the Travel Act cases previously mentioned.[7]

Cisneros's contention that Garza's lie during the telephone conversation--that he had already found someone to commit the murder--actually hindered, rather than facilitated, the murder is not persuasive. It was only Martinez's constant cajoling of Garza that prompted Garza to accelerate his efforts to find the hit men. In short, those telephone conversations facilitated Martinez's efforts in getting Garza to find them.

---

[7]In Perrin, 580 F.2d 730, the defendants had bribed an employee of a geophysical surveyor to obtain seismic data. After obtaining the data, one of the defendants made an interstate telephone call to lawfully purchase maps to make sense of that data. The court held that the interstate nexus to the underlying crime was sufficient in that case. Id. at 736.

Similarly, in Pecora, 693 F.2d 421, a single interstate phone call again satisfied the interstate nexus by "facilitat[ing]" a bribery scheme. There had already been numerous discussions about payoffs and even one $9,000 payoff during the course of the scheme. During that interstate call, all that occurred was that the details of the scheme were further discussed. But the court held that this was enough to meet the interstate nexus hurdle, and that there was no exception for cases where the interstate nature of the call was fortuitous and incidental. Id. at 424.

Finally, in Garrett, 716 F.2d at 266, a call requesting funds for a bribery scheme "facilitated" and made the bribery scheme "easier," thereby constituting a sufficient interstate nexus.

21

Because these telephone calls satisfy the interstate nexus requirement, we need not address the more complicated issue, the car travel between Mexico and Texas.

## II

Cisneros raises several other arguments on appeal, none of which require reversal of her conviction.

## A

Cisneros asks for a new trial based upon two instances of the government eliciting testimony about state court proceedings related to the murder. The trial court had issued an order that prohibited eliciting testimony that Cisneros had been tried for the offense in state court.

First, it is true that the government improperly elicited testimony in violation of the order:

```
Q:   Do you remember what you charged him [Garza] with?
A:   Yes, sir.
Q:   What was that?
A:   Capital Murder.
Q:   The same charge that you had charged Maria
     Martinez and Dora Cisneros with?
A:   Yes, sir.
```

Defense counsel immediately moved for a mistrial, which the trial court denied.

We will not reverse the court's denial because it was not an abuse of discretion. United States v. Krout, 56 F.3d 643, 647 (5th Cir. 1995). "A new trial is required only if there is a 'significant possibility' that the prejudicial evidence had a

22

'significant impact' upon the jury verdict, viewed in light of the entire record." United States v. Layne, 43 F.3d 127, 134 (5th Cir. 1995). Simply stated, in a trial lasting seven days, any prejudicial effect from this interchange is not enough to justify a mistrial. The government spent almost five-and-a-half days presenting a thorough case-in-chief. The defense, on the other hand, used half a day to present its case.[8] With such a gross imbalance of evidence in favor of the government, it is hard to believe that the brief interchange above had any impact on the jury's decision. Denial of a mistrial was not an abuse of discretion.

Second, the government elicited testimony six days after this interchange that Garza had been convicted of capital murder in the Fischer homicide. Defense counsel objected, and the trial court overruled the objection. Cisneros now charges that the government tried to get the jury to infer that since Garza and Cisneros were both charged, and since Garza was convicted, that Cisneros was also tried in state court.

The admission of this testimony was not an abuse of discretion, since there was no chance of any "significant impact" on the jury verdict. United States v. Morgan, 117 F.3d 849, 861 (5th Cir. 1997); Layne, 43 F.3d at 134. By itself, this testimony

_____

[8]The seventh day was spent on closing argument and jury instruction.

23

did not violate the district court's order.  The defense can only take issue with the testimony by tying it to the earlier testimony about charges against Cisneros.  There is no reason to believe that the jury drew such a connection to conclude that Cisneros had also been convicted.  The government had good reason, moreover, to ask Garza about his conviction.  The prosecutors wanted to minimize the effectiveness of any cross-examination about the deal they had given him.

B

Cisneros next objects to denial of five of her proposed jury instructions.  We review refusal to include requested instructions for an abuse of discretion.  United States v. Storm, 36 F.3d 1289, 1294 (5th Cir. 1994).  Defendants are entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in their favor, Mathews v. United States, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988).  But refusal to include a requested instruction is reversible error only if the requested instruction is substantially correct, the actual charge given the jury did not substantially cover the content of the proposed instruction, and the omission of the proposed instruction would seriously impair the defendant's ability to present a defense.  United States v. Pettigrew, 77 F.3d 1500, 1510 (5th Cir. 1996).

Cisneros first sought to instruct the jury that the use of the facility in foreign commerce had to have been "in furtherance" of the murder-for-hire. As we have previously observed, "in furtherance" is not the requirement in this circuit; "facilitated" or "made easier" is. Garrett, 716 F.2d at 266. That is, Garza's calls need not have been made for the purpose of furthering the murder-for-hire. It is enough that those calls facilitated the scheme incidentally, or by mere happenstance. Id. at 265-66.

Here, it may well be true that Garza did not place the calls "in furtherance" of the murder-for-hire scheme. He called Martinez for marital advice. Martinez was the one who would bring up the subject of the Fischer murder. But those international calls gave Martinez the opportunity to pursue her earlier requests that Garza arrange the murder. In that sense, they facilitated the murder, even though the use of the telephone across national boundaries was purely incidental. The difference between "in furtherance" and "facilitated," therefore, can be significant. For that reason, Cisneros's proposed instruction was not substantially correct, and the district court's failure to give it does not constitute reversible error. United States v. Pettigrew, 77 F.3d 1500, 1510 (5th Cir. 1996).[9]

---

[9]We note that the district court gave no instruction on the nexus requirement.

Cisneros's second proposal was a "theory of the defense" instruction. What she requested was essentially an extended instruction on the government's burden of proof. Since the district court repeatedly emphasized that the government carried that burden, its instruction covered Cisneros's desired instruction. Moreover, the court's refusal did not hinder Cisneros's presentation of a defense in any way.

Part of Cisneros's "theory of the defense" instruction did go beyond restatement of the burden of proof. It set forth Cisneros's position that any of Pizana's travel in foreign commerce on March 2 was related to the stolen vehicle or drug businesses, not the murder-for-hire. It also explained that Cisneros believed any of Garza's calls to Martinez were made for the purpose of discussing his marital difficulties. Since these represent mere "judicially narrated accounts" of Cisneros's facts, their submission to the jury was unnecessary. See Pettigrew, 77 F.3d at 1514.

Cisneros's third proposed instruction sought to limit the jury's consideration of tape-recorded conversations between Garza and Martinez and between Martinez and Cisneros.[10] When the government offered those tapes into evidence, however, Cisneros's counsel failed to object properly:

THE COURT: Any objection to the admission of the tapes?

_____

[10]These conversations related to the purpose behind money transfers between Garza, Martinez, and Cisneros.

26

MR. CANALES: No.

...

MR. CANALES: Multiple purposes of impeachment, I understand.

MR. MOSBACKER: No, Your Honor. They are being offered for purposes of rehabilitation of the witness and also for completeness of the conversations.

THE COURT: There being no objections, all [the tapes] are admitted into evidence.

Assuming that some portion of the tapes included hearsay, Cisneros did not raise a timely objection to its admission. She is required to do so under Fed.R.Evid. 103(a)(1). United States v. Wake, 948 F.2d 1422, 1435 (5th Cir. 1991). Without such an objection, we review for plain error. Id. The admission of this evidence, to the extent it was erroneous, did not seriously affect the fairness, integrity, or public reputation of judicial proceedings, especially since it was the defendant who first alluded to portions of the tapes. See United States v. Olano, 507 U.S. 725, 731-36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Cisneros's fourth requested instruction was an explanation of "causation":

A person "causes" another to travel in foreign commerce or to use facilities in foreign commerce if he does an act with knowledge that the foreign travel or use of facilities in foreign commerce will follow in the ordinary course of business, or where such foreign travel or use of facilities in foreign commerce can reasonably be foreseen, even though not actually intended.

Although this instruction is loosely based on the causation requirement for violation of the federal mail fraud statute, see United States v. Sneed, 63 F.3d 381, 385 n.4 (5th Cir. 1995), the

district court did not abuse its discretion in rejecting the instruction. First, we note that the source was, to be sure, from a different statute. Second, and more importantly, Cisneros's version is simply incorrect. One problem is that it confuses intent with causation: ". . . if he does an act *with knowledge* that the . . . use of the facilities in foreign commerce will follow." Yet, even more significantly, the instruction requires that the *specific* use of the facility in interstate travel that actually occurred must have been foreseeable: "where *such* foreign travel or use of facilities in foreign commerce can reasonably be foreseen." That is not what is required by the simple causation element. Consequently, her proposed instruction was not substantially correct, and the failure to give it does not constitute an abuse of discretion.[11]

Cisneros's fifth instruction concerned the five-year statute of limitations. Its omission did not impair Cisneros's ability to present a defense because there was no defense under the statute of limitations. It is well recognized that the time period begins to

---

[11]Again, we note that the district court failed to give an instruction explaining the notion of causation to the jury. Instead, the one it gave related to the mens rea requirement with respect to causation. The reason for this instruction instead of one explaining causation can be attributed, at least in part, to the confusion in Cisneros's proposed instruction, which mixed the two together. This confusion continued to appear in Cisneros's briefs to this court.

run when the crime is complete.  <u>Toussie v. United States</u>, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970).  And one of the elements of the federal murder-for-hire offense is receipt of pecuniary value or a promise or agreement to pay.  18 U.S.C. § 1958.  <u>Accord</u> <u>United States v. Finley</u>, 175 F.3d 645, 646 (8th Cir. 1999); <u>United States v. Sanchez</u>, 3 F.3d 366, 367 (11th Cir. 1993).[12]

In this case, Cisneros's indictment charged her with "caus[ing] another to . . . use a facility in foreign commerce . . . with the intent that the murder of Albert Joseph (Joey) Fischer, Jr. be committed . . . as consideration for a promise and agreement to pay, <u>and the receipt of, $3,000</u>."  The crime, as charged and tried by the government, was complete upon the receipt of the $3,000 payment.  The government presented uncontroverted testimony that Martinez paid Garza $3,000 on the day of the murder, March 3, 1993.  Cisneros was indicted less than five years later, on February 23, 1998.  The statute of limitations, therefore, was not a defense available to Cisneros.[13]

---

[12]This conclusion is consistent with our decision in <u>Thompson</u>, 130 F.3d 676.  In that case, payment occurred simultaneously with use of the facility in interstate commerce--payment was sent by mail.  Thus, both elements of the offense were met at the same time and completed the offense.

[13]Cisneros's additional contention, that evidence of the foreign calls fell outside the statute of limitations, is meritless:

> The statute of limitations is a defense to prosecution, not a rule of evidence. Therefore, once prosecution is

Cisneros's next argument, that the district court erred in admitting the evidence of Fischer's murder under Fed.R.Evid. 403, is foreclosed by United States v. Hall, 152 F.3d 381, 400-03 (5th Cir.), cert. denied, 119 S.Ct. 1767 (1999). Contrary to Cisneros's assertion, her offer to stipulate to the shooting of Fischer did not reduce the probative value of evidence of how Fischer's parents found their son, the pathologist's testimony about Fischer's autopsy, or the photographs of Fischer's corpse. This testimony and these pictures were not more gruesome or more disturbing than those admitted in Hall or the cases cited therein. See Hall, 152 F.3d at 401 (citations omitted). The probative value of the challenged evidence, therefore, was not substantially outweighed by the danger of unfair prejudice. See id. (citations omitted).[14]

---

timely instituted, the statute of limitations has no bearing on the admissibility of evidence. It would be a bizarre result indeed if a crime properly prosecuted within the limitations period could not be proven because an essential element, such as intent, could only be established by proof of incidents occurring outside the period.

United States v. Ashdown, 509 F.2d 793, 798 (5th Cir. 1975). In addition, elements of a continuing offense, such as we have here, may fall outside the statute of limitations period without running afoul of the statute of limitations. United States v. Bustamante, 45 F.3d 933, 942 (5th Cir. 1995).

[14]Cisneros's reliance on Old Chief v. United States, 519 U.S. 172, 183 n.7 (1997) is misplaced. The Supreme Court expressly noted that its holding was limited to cases involving proof of felon status. Old Chief, 519 U.S. at 183 n.7.

We also reject Cisneros's argument that the conviction should be reversed because the district court failed to maintain an appearance of impartiality in its questioning of witnesses and comments made during the trial. First, Cisneros contends that in questioning Garza, the district court made the government's case instead of merely clarifying the evidence. Second, Cisneros maintains that the district court unfairly assisted the government in overcoming objections. One was a hearsay objection to a police officer's testimony about Ramiro Moya's involvement in Fischer's murder, and the other was an objection to the form of the question asking Moreno about Cuellar's state of mind after Palomares telephoned to report the murder. Third, Cisneros argues that the court's treatment of defense counsel exhibited favoritism in front of the jury.

After reviewing the transcript, we cannot conclude that the district court's behavior was so "prejudicial that it denied the defendant a fair, as opposed to a perfect trial." United States v. Bermea, 30 F.3d 1539, 1569 (5th Cir. 1994) (citations omitted). The questions to the witnesses, periodic assistance to government counsel, and occasional chastisement of defense counsel did not make the trial unfair.

The first issue is the court's questioning of witnesses. During trial, Garza explained that he had called Martinez from San

31

Fernando, 100 miles south of the Rio Grande.  The district court interjected and asked Garza if San Fernando was located in Mexico and whether he had talked to Martinez from Mexico.  Garza answered both questions affirmatively.  The court also asked Garza whether he and Martinez had discussed "something else" beyond his marital problems when he called her from Mexico.  Garza replied that the two had discussed whether he had found the "guys [that] she [Martinez] wanted to cause harm to this boy."

Garza later testified that he met Olivarez in Dallas to tell him about "a lady in Brownsville who had . . . $3000.00 to beat up or kill this person."  Garza then said he provided a picture and address to help Olivarez identify Fischer.  The district court immediately asked Garza whether he had the picture during his initial conversation with Olivarez in Dallas.  The court also asked Garza whether Olivarez agreed during the meeting to commit the murder.  Garza answered "whenever they would go to Brownsville."

The district court's questions did not deny Cisneros a fair trial.  A trial court has the discretion to clarify testimony, even if that elicits facts harmful to the defendant.  United States v. Saenz, 134 F.3d 697, 708 (5th Cir. 1998) (citations omitted).  The district court may also bring out new facts through its questioning.  United States v. Cantu, 167 F.3d 198, 202 (5th Cir. 1999), petition for cert. filed, 67 U.S.L.W. 3749 (U.S. Jun. 1, 1999) (No. 98-1928) (citations omitted).  The trial court stayed

32

within these limits.  Garza was a difficult witness to understand because of problems with English.  The court's questions were designed to clarify his vague, confusing, and often incomplete statements.

The record further establishes that the court's assistance in overcoming Cisneros's objections did not exhibit bias in the government's favor.  In both instances, the district court merely instructed prosecutors to rephrase their questions.  The district court properly controlled the tempo of the trial so as to avoid repetitious objections and to keep the proceeding moving forward. See Bermea, 30 F.3d at 1570-71.

Finally, Cisneros points to several instances where the court treated defense counsel with less than perfect courtesy.  Having examined the transcript, these do not go beyond acceptable courtroom behavior, especially in the face of some of defense counsel's antics.

In sum, we find that the district court's intervention in the trial hardly rises to the level we found objectionable in Saenz, 134 F.3d at 713-14.  Indeed, nothing in the district court's questions or comments "could have led the jury to a predisposition of guilt by improperly confusing the functions of the judge and the prosecutor."  Bermea, 30 F.3d at 1569 (citing United States v. Samak, 7 F.3d 1196, 1197-98 (5th Cir. 1993)).

The district court, moreover, twice instructed the jury regarding the court's participation in the trial. We have previously held that curative instructions such as this one ameliorate potential prejudicial effect of a district court's comments or questions. See Bermea, 30 F.3d at 1571-72 (citations omitted). At the beginning of the trial as well as at the close of the evidence, the district court explained to the jury that it did not have an opinion about the case, and to disregard any statements that might indicate otherwise. The court then charged the jury not to give the court's question more or less weight than those of the lawyers.

E

Finally, the district court did not abuse its discretion in admitting Moreno's testimony under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(e). Cisneros argues that assuming arguendo there existed a conspiracy to kill Fischer, the admission of Moreno's testimony under the co-conspirator exception was in error because Moreno had no involvement in the murder. We find this argument frivolous.

Moreno testified that he and Garza were both employed in Cuellar's organization and that Palomares and Olivarez acted as hit men for the organization. Moreno also acknowledged that because he

34

was a member of Cuellar's crime family,[15] Cuellar told him about conversations with Garza concerning the "Brownsville murder."  In early February 1993, Moreno accompanied Garza to a Dallas gun shop where Garza bought a .38 Super--the same type of pistol as the one used to shoot Fischer.  The record further shows that Moreno gave Garza the purchase money, which had been supplied by Cuellar.  Immediately after the sale, Moreno took possession of the weapon and delivered it to Cuellar that same day.  Moreno later overheard a conversation between Palomares and Cuellar, during which Palomares stated that he had killed a person in Brownsville.  Finally, Moreno stated that Palomares, Pizana, and Olivarez were involved in the "Brownsville murder" and that the murder was committed because of a contract Garza made with "a certain person."

The government met its burden of proving the co-conspirator exception to the hearsay rule by a preponderance of the evidence.  See United States v. Narviz-Guerra, 148 F.3d 530, 536 (5th Cir.), cert. denied, 119 S.Ct. 601 (1998); United States v. Ruiz, 987 F.2d 243, 247 (5th Cir.), cert. denied, 510 U.S. 855 (1993).  Moreno was integrally involved in the operations of Cuellar's organization, the one that planned and executed Fischer's murder.

III

---

[15]Moreno was an enforcer for Cuellar.  He picked up drug money and delivered drugs to Cuellar's stash houses.

For the reasons stated herein, Cisneros's conviction is in all respects

A F F I R M E D.