**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

Nos. 98-40568 & 98-40955

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BETTY LOUISE MAREK,

Defendant-Appellant.

consolidated with

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DORA GARCIA CISNEROS,

Defendant-Appellant.

_____

Appeals from the United States District Court
For the Southern District of Texas
_____
January 4, 2001

Before REYNALDO G. GARZA, POLITZ, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.[*]

WIENER, Circuit Judge:

---

[*] Chief Judge King did not participate in this decision.

According to its title, the federal murder-for-hire statute, 18 U.S.C. § 1958 ("§ 1958"), criminalizes the "[u]se of <u>interstate commerce facilities</u> in the commission of murder-for-hire."[1]  The statute proscribes paying another to commit murder, but only when the defendant either (1) "travels in or causes another (including the intended victim) to travel in interstate or foreign commerce," or (2) "uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce."[2] Both of the instant cases concern only the second prong of § 1958's jurisdictional element, the <u>use</u> of an interstate (or foreign) commerce facility.

In <u>United States v. Cisneros</u>,[3] a panel of this court suggested in <u>dicta</u> that, to satisfy the jurisdictional element, a facility must be used in an <u>inter</u>state fashion, i.e., that <u>intra</u>state use of a facility would not suffice, even though that facility is one that generally is an interstate commerce facility.  In contrast, a divided panel of this court held, in <u>United States v. Marek</u>,[4] that wholly <u>intra</u>state use of a facility that is an interstate commerce facility is sufficient to satisfy § 1958's jurisdictional element.[5]

---

[1]Emphasis added.

[2]18 U.S.C. § 1958.

[3]203 F.3d 333 (5th Cir. 2000), <u>vacating</u> 194 F.3d 626 (5th Cir. 1999).

[4]198 F.3d 532 (5th Cir. 1999), <u>reh'g granted</u>, 206 F.3d 449 (5th Cir. 2000).

[5]<u>Id.</u> at 538.

The <u>Marek</u> majority acknowledged <u>Cisneros</u> but reasoned that it was not binding because, in furtherance of her murder-for-hire scheme, Cisneros had caused international telephone calls to be made, an activity that indisputably satisfied the jurisdictional element even if Marek's wholly <u>intra</u>state communication might not. Thus, the portion of <u>Cisneros</u> that suggests that § 1958's application is limited to <u>interstate</u> use of an interstate commerce communication facility is <u>dicta</u>.[6]

To reconcile these differences and announce a consistent position for this Circuit, we voted to rehear both cases en banc,[7] which had the collateral effect of vacating both panel decisions. We now adopt the position taken by the panel majority in <u>Marek</u> and hold that § 1958's <u>use</u> of a "facility in interstate commerce" is synonymous with the use of an "interstate commerce facility" and satisfies the jurisdictional element of that federal murder-for-hire statute, irrespective of whether the particular transaction in question is itself <u>inter</u>state or wholly <u>intra</u>state.

**I.**
**FACTS AND PROCEEDINGS**

A.    <u>Marek</u>

The facts are not in dispute. Defendant-Appellant Betty Louise Marek pleaded guilty to paying an undercover FBI agent, who was posing as a hit-man, to murder her boyfriend's paramour. Marek

---

[6]<u>Id.</u> at 534 & n.1.

[7]206 F.3d 448, 448-49 (5th Cir. 2000).

3

was arrested after she used Western Union to transfer $500 to the putative hit-man. Marek initiated the wire transfer in Houston, Texas, and it was received in Harlingen, Texas. The government introduced no evidence to show that the Western Union transmission actually crossed the Texas state line en route from Houston to Harlingen, so we must assume that it did not.[8]

After the district court had accepted Marek's guilty plea and subsequently sentenced her, she appealed her conviction, urging that the district court erred when it found that she had admitted to facts that satisfied each legal element of the crime charged. Convinced that Western Union is "a facility in interstate commerce," and that this phrase is synonymous with "interstate commerce facility," a divided panel of this court affirmed her conviction, holding that Marek's wholly intrastate use of Western Union was sufficient to satisfy the jurisdictional element of §1958.[9]

---

[8]As described in a recent Fifth Circuit case, however, the Western Union procedure for wiring money from one Texas city to another (in that case, from Lufkin to Beaumont) required Western Union agents in both cities to call the company's main computer in Bridgeton, Missouri. See United States v. Brumley, 79 F.3d 1430, 1432-33 (5th Cir. 1996), rev'd on other grounds en banc, 116 F.3d 728, 731 (5th Cir. 1997) (affirming convictions and noting that the wire transfers "were accomplished electronically through a Western Union facility located outside of Texas"); see also United States v. Davila, 592 F.2d 1261, 1263 (5th Cir. 1979) (upholding wire fraud conviction under 18 U.S.C. § 1343 of defendant who used Western Union to send money between San Antonio and McAllen when all wire transfers were routed through Middletown, Virginia).

[9]The facts are set forth more fully in the panel majority's opinion. Marek, 198 F.3d at 533.

4

B.    Cisneros

The relevant facts in Cisneros also are undisputed at this juncture. Doris Cisneros wanted to have her daughter's erstwhile boyfriend killed. Cisneros told this to her fortune teller and asked if the seer would find someone to commit the murder for a price. Acting as Cisneros's agent, the clairvoyant —— through another client —— ultimately located and employed two hit-men for Cisneros. In doing so the oracle placed and received international phone calls between Texas and Mexico. The hit-men traveled from Mexico to Brownsville, Texas, where they shot and killed Cisneros's intended victim.[10] A jury convicted Cisneros, and she appealed.

A panel of this court concluded that a reasonable jury could have found that (1) the fortune teller had participated in international telephone calls as Cisneros's agent, and (2) those calls were sufficiently connected to the murder to be "in furtherance" of that crime.[11] The panel therefore affirmed Cisneros's conviction.

A crucial factual distinction between Marek and Cisneros exists: In Cisneros the subject telephone calls were unquestionably international so the use of the telephone facility was international ("foreign"), as is the telephone facility itself;

---

[10]The facts are set forth more fully in the panel opinion. Cisneros, 203 F.3d at 337-39.

[11]Id. at 343-45.

5

in Marek, however, there was only an intrastate communication (a wire transfer of funds between two Texas cities), albeit the communication facility, Western Union, is an interstate commerce facility. Therefore, to affirm Marek we must conclude that § 1958 reaches intrastate use of a facility in interstate commerce. In Cisneros, on the other hand, even if we assume arguendo that the statute should be accorded the narrowest interpretation possible, we must affirm Cisneros's conviction on the strength of the international (foreign) telephone calls.

## II.
## STANDARDS OF REVIEW

Cisneros was convicted by a jury. If, after viewing the evidence and all reasonable inferences in the light most favorable to the verdict, we conclude that a rational trier of fact could find that the government proved each essential element of the crime of conviction beyond a reasonable doubt, we must affirm.[12]

Marek, in contrast, pleaded guilty. We review guilty pleas for compliance with Rule 11 of the Federal Rules of Criminal Procedure. Here, the determinative question is whether there is an adequate factual basis in the record from which the district court could conclude as a matter of law that Marek's conduct satisfies each element of § 1958. That Marek pleaded guilty —— a legal conclusion on her part —— ostensibly admitting to discrete facts supporting the charge against her, is not itself sufficient to

---

[12]Cisneros, 203 F.3d at 343 (citing United States v. Grossman, 117 F.3d 255, 258 (5th Cir. 1997)).

6

support her guilty plea.[13]  Subsection (f) of Rule 11 requires the district court to determine that the <u>factual</u> conduct to which the defendant admits is sufficient <u>as a matter of law</u> to constitute a violation of the statute.[14]  Rule 11(f) reads:

> **(f) Determining accuracy of plea.**  Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

The Supreme Court has explained that this requirement —— mandating that the district court compare (1) the conduct to which the defendant admits with (2) the elements of the offense charged in the indictment or information —— "is designed to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge <u>but without realizing that his conduct does not actually fall within the charge</u>.'"[15]  Implicit in the district court's acceptance of Marek's plea of guilty, then, was its determination that her admitted conduct satisfies every legal element of the federal murder-for-hire statute.

Marek did not raise a challenge to the adequacy of the factual basis underlying her guilty plea in the district court, either by

---

[13]<u>United States v. Briggs</u>, 939 F.2d 222, 227-28 (5th Cir. 1991); <u>United States v. Oberski</u>, 734 F.2d 1030, 1031 (5th Cir. 1984).

[14]<u>Briggs</u>, 939 F.2d at 227-28.

[15]<u>McCarthy v. United States</u>, 394 U.S. 459, 467 (1969) (quoting Fed. R. Crim. P. 11, Notes of Advisory Committee on Criminal Rules) (emphasis added).

7

making her plea conditional pursuant to Rule 11(a)(2) or by objecting thereafter, such as at her sentencing. Rather, she raised it for the first time on appeal. We have repeatedly held that when a defendant, for the first time on appeal, presents a straightforward issue of law —— here, whether the undisputed factual basis is sufficient as a matter of law to sustain the guilty plea —— we will review that issue for plain error.[16]

Plain error review requires the appellant to show (1) there is an error, (2) that is clear and obvious, and (3) that affects his substantial rights.[17] If these factors are established, the decision to correct the forfeited error still lies within our sound discretion, which we will not exercise unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.[18]

The first of the three facets of plain error that we must address is whether there was error. To answer this threshold question when Rule 11(f) is implicated, we must examine, parse, and interpret § 1958, the criminal statute under which Marek was

---

[16]United States v. Angeles-Mascote, 206 F.3d 529, 530 (5th Cir. 2000); see also United States v. Johnson, 194 F.3d 657, 660 (5th Cir. 1999), vacated on other grounds, 120 S. Ct. 2193 (2000); United States v. Ulloa, 94 F.3d 949, 951-54 (5th Cir. 1996); United States v. Knowles, 29 F.3d 947, 950-51 (5th Cir. 1994).

[17]United States v. Calverly, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc) (citing United States v. Olano, 507 U.S. 725, 730-37 (1993)), abrogated in part on other grounds, Johnson v. United States, 520 U.S. 461 (1997).

[18]Olano, 507 U.S. at 735-36.

convicted of murder-for-hire. Only by determining the elements of that crime and comparing each element to the facts admitted by Marek, as set forth in the factual basis during the plea colloquy, can we determine if there was error <u>vel</u> <u>non</u>.

### III.
### STATUTORY CONSTRUCTION

In Marek's case we must ask whether, for purposes of satisfying the jurisdictional element of the federal murder-for-hire statute, it is sufficient that the defendant used an interstate commerce facility in an <u>intra</u>state fashion. Asked differently, is it necessary that both (1) the facility <u>and</u> (2) the defendant's use of that facility be in interstate or foreign commerce? To answer this question, we will look first to the plain language of the statute and second to its statutory context.

A.    <u>Statutory Language</u>

**§ 1958. Use of interstate commerce facilities in the commission of murder-for-hire**

(b)    Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, <u>or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce</u>, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined [or imprisoned] under this title[.]

(b)    As used in this section and section 1959 —

(1)    "anything of pecuniary value" means anything of value in the form of money, a negotiable

9

instrument, a commercial interest, or anything else the primary significance of which is economic advantage;

(2) "<u>facility of interstate commerce</u>" includes means of <u>transportation</u> and <u>communication</u>; and

(3) "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.[19]

As is patent on the face of the statute, this crime can be committed by engaging in either of two distinct activities: (1) <u>travel</u> or (2) <u>use</u>. If, in <u>Marek</u> or <u>Cisneros</u> (or both), the jurisdictional element was satisfied, it must have been under the use prong, as the travel prong is nowhere implicated.[20] The travel and use prongs are distinguishable by the divergent natures of the two activities: <u>Travel</u> requires the physical movement of a person, such as by walking, running, or riding in or on a bike, car, wagon, train, bus, or airplane; in contrast, <u>use</u> contemplates a perpetrator who remains essentially stationary while causing an inanimate object to be (1) communicated (e.g., a letter, telegram, or money order) or (2) transported (e.g., a gun, a bomb, or cash).[21]

---

[19]18 U.S.C. § 1958 (emphasis added).

[20]The record in <u>Cisneros</u> reveals that the hit-men traveled from Mexico to Texas to perform the murder-for-hire. The panel concluded that the jurisdictional element was satisfied by the international telephone calls and thus did not consider if the jurisdictional element was satisfied by international travel. <u>Cisneros</u>, 203 F.3d at 345. We do the same.

[21]<u>See</u> 18 U.S.C. § 1958(b)(2) (stating that "'facility of interstate commerce' includes means of transportation and communication").

10

The statute's definition of travel never mentions the facility; presumably a perpetrator could violate the travel prong on foot, using no "facility" at all, as, for example, by hiking cross-country to deliver the blood money.

The key question of statutory construction presented in <u>Marek</u> is whether, under the use prong of § 1958, the phrase "in interstate or foreign commerce" modifies "use" or modifies "facility." Purely from a structural viewpoint, we must conclude that "in interstate or foreign commerce" is an adjective phrase that modifies "facility," the noun that immediately precedes it — <u>not</u> an adverbial phrase that modifies the syntactically more remote verb, "[to] use." We see the former conclusion as the more natural and sensible reading of the relevant portion of the statute. Primarily because of the proximity of "in interstate or foreign commerce" to "facility," the word which that phrase modifies is facility and not use. A contrary conclusion — that "in interstate or foreign commerce" modifies "use" — would require a strained structural interpretation of the statute.[22]

---

[22]The dissent argues that the statute's drafters need have resorted to an unduly awkward grammatical construction to modify "in interstate or foreign commerce" with "use." Were that Congress's intention, however, the statute could have been phrased smoothly several different ways: To criminalize any use of the mail but only interstate use of other facilities, for example, the drafters could have targeted "interstate use of a facility or use of the mail with intent that a murder be committed." To further narrow the statute and criminalize only interstate use of the mail or any other facility, one possible phrasing would be "interstate use of a facility or the mail with intent that a murder be committed." Congress knows how to write this requirement when it so chooses. <u>See, e.g.</u>, 18 U.S.C.A. § 247(b) (formerly

11

B.    Statutory Context

When it adopted § 1958, Congress was acting within the second of three broad categories identified by the Supreme Court in United States v. Lopez[23] as conduct appropriately subject to regulation under the Commerce Clause.[24]  Of the second category, the Court wrote that "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities."[25]  When Congress regulates and protects under the second Lopez category, therefore, federal jurisdiction is supplied by the nature of the instrumentality or facility[26] used, not by separate proof of interstate movement.[27]

criminalizing damage to religious property by a defendant who "uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce"; amended to apply to offense that "is in or affects interstate or foreign commerce" by Church Arson Prevention Act of 1996, Pub. L. No. 104-155, § 3(3), 110 Stat. 1392 (1996)).

[23]514 U.S. 549 (1995).

[24]U.S. Const. art. 1, § 8, cl. 3.

[25]Lopez, 514 U.S. at 558 (emphasis added).  The Court cited, inter alia, Shreveport Rate Cases, 234 U.S. 342 (1914) (holding that the Interstate Commerce Commission could regulate intrastate railway rates to protect interstate commerce), and Southern R. Co. v. United States, 222 U.S. 20 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in intrastate commerce).

[26]We find no meaningful distinction between the terms "facilities" and "instrumentalities" of interstate commerce. Cisneros, 203 F.3d at 340 n.4.

[27]See Peter J. Henning, Maybe It Should Just Be Called Federal Fraud: The Changing Nature of the Mail Fraud Statute, 36 B.C. L.

Under statutes similar to § 1958, federal jurisdiction based on intrastate use of interstate facilities is an appropriate exercise of the commerce power, as this and other circuit courts repeatedly have found.

In United States v. Heacock,[28] this circuit concluded that the U.S. Post Office is a "facility in interstate commerce," and that intrastate mailings satisfied the jurisdictional requirement of the Travel Act.[29] Significant to our analysis today, the Heacock opinion alludes to the mail's unique history but never mentions Congress's postal power,[30] instead stressing the status of the mail as an interstate commerce facility:

> In other words, whenever a person uses the United States Post Office to deposit, to transport, and to deliver parcels, money, or other material by means of the mail, that person clearly and unmistakably has used a "facility in interstate commerce," irrespective of the intrastate destination of the item mailed.[31]

---

Rev. 435, 471 (1995).

[28]31 F.3d 249, 255 (5th Cir. 1994).

[29]18 U.S.C. § 1952.  We have previously held that it is appropriate to interpret § 1958 in light of § 1952 given that the two sections employ similar language, and that § 1958 was intended to supplement § 1952. United States v. Edelman, 873 F.2d 791, 794 (5th Cir. 1989).

[30]U.S. Const. art. 1, § 8, cl. 7.

[31]Heacock, 31 F.3d at 255.  The dissent argues that our Heacock decision was based on the Second Circuit's reasoning in United States v. Riccardelli, 794 F.2d 829 (2d Cir. 1986), that the mail is a "special case, separate and distinct from 'facilities in interstate or foreign commerce.'"  While it is undoubtedly true that the mail is a "special case," the Riccardelli analysis that we

13

Congress had made the sufficiency of intrastate mailings plain in a 1990 amendment entitled "Clarification of applicability of 18 U.S.C. 1952 to all mailings in furtherance of unlawful activity."[32]  The amendment changed § 1952's wording slightly to mirror that of § 1958, targeting "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce."[33]  As Congress thus expressly made clear that § 1952 applies to intrastate mailings, and did so by importing § 1958's wording into § 1952, logic dictates that precisely the same wording in § 1958 must apply equally to intrastate use of other interstate facilities, such as Western Union.

In a similar vein, through passage of a 1994 amendment to the federal mail fraud statute, Congress expanded 18 U.S.C. § 1341 to

actually quoted in Heacock — reproduced here in its entirety — does not support the dissent's inference:  "'The positioning of the phrase 'including the mail' in the statute singles out the mail for special treatment and thus consistent with the historical understanding of the United States mail, equates the use of the mail with the use of other facilities of interstate and foreign commerce; it does not indicate that the mailing itself must be interstate.'"  Heacock, 31 F.3d at 255 (quoting Riccardelli, 749 F.3d at 831) (emphasis added).

[32]Crime Control Act of 1990, Pub. L. No. 101-647, § 1604, 104 Stat. 4789, 4843 (1990); see also Krantz v. United States, 1999 WL 557524, at *4 (E.D.N.Y. 1999), appeal dismissed, 224 F.3d 125 (2d Cir. 2000).  The amendment was passed a year after the Sixth Circuit held in United States v. Barry, 888 F.2d 1092 (6th Cir. 1989), that only interstate use of the mail satisfied § 1952's jurisdictional nexus.  The Second Circuit earlier had decided the opposite in Riccardelli.

[33]Before amendment, § 1952 applied to "[w]hoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail."  This is the language interpreted in Heacock.

14

reach private interstate commercial carriers, such as Emery, DHL, and Federal Express, in addition to the U.S. Postal Service. Although no circuit court has addressed whether that amendment requires the crossing of state lines to establish jurisdiction, one district court recently held that the amended statute does cover "purely intrastate delivery of mails by private or commercial carriers as long as those carriers engage in interstate deliveries. . . .While jurisdiction lies only under the Commerce Clause for the use of private or commercial carriers, Congress may still regulate their intrastate activities because they are instrumentalities of interstate commerce."[34]  Here again, the conclusion is appropriate because intrastate use of interstate facilities is properly regulated under Congress's second-category Lopez power.

Mail and delivery services are not the only "means of transportation and communication" amenable to congressional Commerce Clause protection under Lopez during wholly intrastate use.  Interstate commerce facilities that have created a criminal federal jurisdictional nexus during intrastate use include telephones,[35] automobiles,[36] and airplanes.[37]  Perhaps most analogous

_____

[34]United States v. Photogrammetric Data Services, Inc., 103 F. Supp. 2d 875, 882 (E.D. Va. 2000).

[35]United States v. Weathers, 169 F.3d 336, 341 (6th Cir. 1999) ("It is well established that telephones, even when used intrastate, constitute instrumentalities of interstate commerce."), cert. denied, 528 U.S. 838 (1999); United States v. Gilbert, 181 F.3d 152, 158-59 (1st Cir. 1999) (finding jurisdiction under 18 U.S.C. § 844(e), concerning threats made "through the use of the

15

to Marek's use of Western Union are the facts of <u>United States v. Baker</u>,[38] an Eighth Circuit case holding that an interstate network of automatic teller machines ("ATMs") is a facility in interstate commerce "squarely within the literal language of the Travel Act."[39] In <u>Baker</u>, the Eighth Circuit upheld a Travel Act conviction based on an extortion victim's cash withdrawal from his local bank using another local bank's ATM.

The <u>Baker</u> court noted that, even though the transaction at issue was strictly local, customers could use the ATM network to

mail, telephone, telegraph, or other instrument of interstate or foreign commerce, or in or affecting interstate or foreign commerce"); <u>United States v. Clayton</u>, 108 F.3d 1114, 1117 (9th Cir. 1997) (cellular telephones); <u>United States v. Houlihan</u>, 92 F.3d 1271, 1292 (1st Cir. 1996) (assuming that telephones are facilities in interstate commerce under § 1958); <u>Alley v. Miramon</u>, 614 F.2d 1372, 1379 (5th Cir. 1980) (stating, in a securities case, that the court "has consistently held that the intrastate use of the telephone may confer jurisdiction over a private action under Section 10(b) and Rule 10b-5." Rule 10b-5 supplies jurisdiction "by the use of any means or instrumentality of interstate commerce or of the mails.").

[36]<u>United States v. Bishop</u>, 66 F.3d 569, 589 (3d Cir. 1995) (writing that Congress's power to criminalize intrastate carjacking "derives from the [automobiles'] status as instrumentalities"); <u>see also</u> <u>United States v. Cobb</u>, 144 F.3d 319, 322 (4th Cir. 1998); <u>United States v. McHenry</u>, 97 F.3d 125, 126 (6th Cir. 1996); <u>United States v. Oliver</u>, 60 F.3d 547, 550 (9th Cir. 1995), <u>rev'd on other grounds</u>, <u>Jones v. United States</u>, 526 U.S. 227 (1999).

[37]<u>United States v. Hume</u>, 453 F.2d 339, 340 (5th Cir. 1971) (finding that 18 U.S.C. § 32, which criminalizes damage to "civil aircraft used, operated, or employed in interstate, overseas, or foreign commerce," protects aircraft even while they are not actually operating interstate).

[38]82 F.3d 273 (8th Cir. 1996), <u>cert. denied</u>, 519 U.S. 1020 (1996).

[39]<u>Id.</u> at 276.

16

make interstate deposits and withdrawals, and the court noted: "Though [the victim's] withdrawal triggered an entirely intrastate electronic transfer between [the two local banks], the jury found that [the defendant] caused [the victim] to use a facility in interstate commerce."[40]

The dissent notes that we are splitting with the Sixth Circuit's interpretation of § 1958 in United States v. Weathers,[41] in which that court found jurisdiction proper based on a defendant's in-state call using a cellular telephone that sent an interstate search signal. Although the holdings of this case and Weathers do not actually conflict with each other, it is true that our reasoning does. As noted above,[42] however, the Sixth Circuit's reasoning that the use of an instrumentality in interstate commerce (i.e., the mail) requires the crossing of state lines was expressly rejected by congressional amendment of the Travel Act.[43] We did not

_____

[40]Id. at 275.

[41]169 F.3d 336 (6th Cir. 1999), cert. denied, 528 U.S. 838 (1999).

[42]See supra note 32.

[43]The Sixth Circuit reasons that a statute regulating a "facility in interstate commerce" governs channels of interstate commerce, the first Lopez category, while a "facility of interstate commerce" falls into the second Lopez category, comprising the instrumentalities of interstate commerce. We conclude that the "use of facilities (in or of) interstate commerce" in violation of § 1958 falls into the second category. Because it is not necessary to this case, we do not decide whether § 1958's "travel in interstate commerce" prong refers to the channels of interstate commerce, or to Lopez's second-category "persons or things in interstate commerce." See Lopez, 514 U.S. at 558.

17

follow that reasoning in Heacock and we decline to do so now, particularly given Congress's use of the very language of § 1958 we interpret today to remove any possible doubt that the Travel Act applies even to intrastate mailings.[44]

We are satisfied that when § 1958 is read as a whole and viewed in context as part of the power of Congress to regulate and protect the instrumentalities of interstate commerce, even when the threat comes from intrastate activities,[45] it becomes clear that the facility, not its use, is what must be "in interstate or foreign commerce." In the instant context, then, when a facility employed to advance murder-for-hire is in interstate or foreign commerce generally, the jurisdictional element of § 1958 is satisfied even though the particular use of the facility on the specific occasion in question is only intrastate. Thus, both (1) Marek's intrastate use of Western Union —— a quintessential facility in interstate commerce —— to transfer funds within Texas, and (2) Cisneros's international telephone calls, are sufficient to satisfy the

---

[44]The dissent, like the Sixth Circuit, would decide this case based on perceived differences in the meanings of "of" and "in." In Dupuy v. Dupuy, 511 F.2d 641, 642-43 (5th Cir. 1975), we found significant that the Securities Act of 1933 based jurisdiction on the use of instruments in interstate commerce, while the Securities Exchange Act of 1934 required use of an instrumentality of interstate commerce. We do not contend that similarly varying phraseology never can have statutory significance; we merely conclude, based on the grammatical structure of § 1958 and the use of both phrases interchangeably in the statute and its legislative history, that Congress's particular deployment of these two prepositions in § 1958 is not dispositive of this case.

[45]Lopez, 514 U.S. at 558.

18

jurisdictional element of § 1958, and —— more importantly —— that jurisdictional element is present in the statute through a valid exercise of congressional Commerce Clause power under the second Lopez category.

As Marek's use of Western Union satisfies the jurisdictional element of the statute, the district court properly discharged its duty under Rule 11(f).  Thus, there was no error.  And, in the absence of an error, there obviously can be no plain error.

C.    Statutory Ambiguity

Marek nevertheless contends that subsection (b)(2) of § 1958 —— which explains that "facility of interstate commerce" includes both means of transportation and means of communication —— introduces an ambiguity into the statute.  Marek's argument goes as follows:    There is an inconsistency between the statute's substantive subsection (§ 1958(a)), which uses the phrase "facility in interstate or foreign commerce," on the one hand, and subsection (b)(2)'s "defining" of the phrase "facility of interstate commerce," on the other.  Marek contends that the phrase used in the substantive subsection ("facility in interstate commerce") implicates a more restricted class of facilities than does the phrase used in the "definitional" subsection ("facility of interstate commerce") because, she insists, for a facility to be in interstate commerce, there must be a nexus between the facility and its use in interstate commerce.  In other words, in Marek's view, facilities are only in interstate commerce when they are

19

employed in an interstate fashion, whereas a facility that is almost always used <u>in</u> interstate commerce (like Western Union) remains a facility <u>of</u> interstate commerce, even in instances when its use is intrastate. Given this inconsistency between the substantive provision of subsection (a) and the explanatory provisions of subsection (b)(2), urges Marek, the substantive subsection must predominate. Thus, continues Marek's argument, as her use of Western Union (which she admits is a facility <u>of</u> interstate commerce) was wholly <u>intra</u>state it was not the <u>use</u> of a facility <u>in</u> interstate commerce, even though the facility itself is an interstate commerce facility. Not surprisingly, we disagree.

First, we find the inconsistency between § 1958(a) and (b)(2) to be more apparent than real, and that use of slightly different phraseology in the clarification section ("of" rather than "in") was not intended by Congress to limit the scope of the statute. Subsection (b)(2) does not "define" facility; rather, it merely clarifies that a facility can be a means of transportation, such as an interstate delivery service, <u>or</u> a means of communication, such as a telegraph or telephone network. As the travel prong of the statute never mentions "facility," subsection (b)(2) applies only to the use prong, merely clarifying that it covers the sending of <u>things</u> as well as <u>messages</u>. For example, sending a bomb from Houston to Harlingen via UPS would involve <u>transportation</u> because a "thing" is sent, but sending a letter from Houston to Harlingen via Federal Express would involve <u>communication</u> because only a

20

message is sent.  In both instances, however, a "facility" is "used."  Despite Marek's effort to create ambiguity out of whole cloth, we perceive none.

The legislative history of § 1958 is even more persuasive.  A 1983 Senate Judiciary Committee report describes the offense punishable under the murder-for-hire statute as "the travel in interstate or foreign commerce or the use of the facilities of interstate or foreign commerce or of the mails, as consideration for the receipt of anything of pecuniary value, with the intent that a murder be committed."[46]  The report later explains that "[t]he gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent and the offense is complete whether or not the murder is carried out or even attempted."[47]  Even though the statute was not intended to usurp the authority of state and local officials, the report states, "the option of Federal investigation and prosecution should be available when a murder is committed or planned as consideration for something of pecuniary value and the proper Federal nexus, such as interstate travel, use of the facilities of interstate commerce, or use of the mails, is present."[48]  In a discussion of the murder-for-hire portion of the

---

[46]S. Rep. No. 98-225, at 304 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3484.

[47]Id. at 306, 3485.

[48]Id. at 305, 3484.

21

bill extending over three pages, the Senate report uses the phrase "facility [or facilities] _of_ interstate commerce" four times and "facility _in_ interstate commerce" only once, drawing no apparent distinction between the two.  We find inescapable the conclusion that "of" and "in" were considered and used by Congress as synonyms in regards to this particular statute.

We hold today that the statute is unambiguous and clear on its face.  But even if we were to assume, for argument's sake, that the statute is ambiguous, any lingering doubt regarding the statute's meaning is laid to rest by the title of the section.  The title of § 1958 —— "Use of interstate commerce facilities in the commission of murder-for-hire" —— plainly eliminates any claim of ambiguity.  The title is unambiguous and clearly employs "interstate commerce" to modify "facility," not "use."  The Supreme Court has held that it is appropriate to consider the title of a statute in resolving putative ambiguities:

> Among other things which may be considered in determining the intent of the legislature is the title of the act. . . . Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived; and in such case the title claims a degree of notice, and will have its due share of consideration. . . . The title of an act cannot control its words, but may furnish some aid in showing what was in the mind of the legislature.[49]

---

[49]Holy Trinity Church v. United States, 143 U.S. 457, 462 (1892).

More recently, the Court reiterated:  "While the title of an act will not limit the plain meaning of the text, it may be of aid in resolving an ambiguity."[50]  The title of § 1958 spells out the activity Congress meant to punish under the statute, eschewing ambiguity.[51]

Section 1958 employs three phrases to describe "facility" in the context of the statute: "interstate commerce facilities" in the title; "facility in interstate or foreign commerce" in subsection (a); and "facility of interstate commerce" in subsection (b)(2). A review of the statute, its legislative history, and the United States Code as a whole indicates that, at least in this statute, Congress used these terms interchangeably as synonyms.

Not to be dissuaded, Marek further contends that:  (1) Even if we reject her construction of the statute in favor of the government's, we must nevertheless find that both constructions are reasonable and choose the narrower one pursuant to the rule of lenity; (2) the government's construction raises doubts about the statute's constitutionality, which must be resolved in a way that avoids potential constitutional infirmity; and (3) the federal

---

[50]McGuire v. Commissioner of Internal Revenue, 313 U.S. 1, 9 (1941) (citations omitted).

[51]The text of other sections of the U.S. Code use the same terminology as that found in § 1958's title.  Both 18 U.S.C.A. § 1961 and § 2516 specifically refer to § 1958 and describe § 1958 as relating to the use of "interstate commerce facilities" in the commission of murder-for-hire.  Thus, the title's reference to "interstate commerce facilities" is not isolated, and cannot be presumed to be accidental.

23

murder-for-hire statute criminalizes conduct that is traditionally the province of state law enforcement, and Congress should not be presumed to have altered the federal-state balance unless it speaks with unmistakable clarity. We dispose of each of these contentions in turn.

1.  Rule of Lenity

The rule of lenity — a rule of narrow construction rooted in concern for individual rights, awareness that it is the legislature and not the courts that should define criminal activity, and belief that fair warning should be accorded as to what conduct is criminal — applies when, but only when, "after seizing every thing from which aid can be derived, the Court is left with an ambiguous statute."[52] We are convinced that this is not such a case and, under these circumstances, we will not "blindly incant the rule of lenity to 'destroy the spirit and force of the law which the legislature intended to and did enact.'"[53]

Additionally, the rule of lenity should not be invoked here because it was no surprise to Marek that murder-for-hire is a serious crime with serious penalties. The principle behind the rule of lenity is that no one should be forced to speculate whether

---

[52]Smith v. United States, 508 U.S. 223, 239-40 (1993) (internal citations, quotations, and alterations omitted) (quoting United States v. Bass, 404 U.S. 336, 347 (1971) (quoting United States v. Fisher, 2 Cranch 358, 386 (1805))).

[53]Huddleston v. United States, 415 U.S. 814, 832 (1974) (alteration omitted) (quoting American Tobacco Co. v. Werckmeister, 207 U.S. 284, 293 (1907)).

24

her conduct is prohibited.[54]  It would be absurd to say that Marek did not know that her conduct —— hiring an assassin to commit murder —— was prohibited.

2.    Constitutional Doubt

The rule of constitutional doubt is likewise inapplicable. Marek contends that a broad application of § 1958 to intrastate activities would violate the Tenth Amendment, compelling adoption of the narrow interpretation of the statute she advocates to save it from constitutional infirmity.  For all the reasons stated above, however, the statute's requirement that a perpetrator either travel in interstate commerce or use an interstate commerce facility confirms that the statute raises no constitutional concerns, given Congress's clear constitutional authority to regulate interstate commerce.  "[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question."[55]

3.    Federal-State Balance

Finally, Marek argues that the intention to alter the federal-state balance in this area —— traditionally the province of state law enforcement —— must be evidenced by unmistakable clarity.  For the same reasons that we reject application of the rule of lenity —— that (1) the statute is plain on its face, and (2) even if we

---

[54]Dunn v. United States, 442 U.S. 100, 112 (1979).

[55]Caminetti v. United States, 242 U.S. 470, 491 (1917).

25

concede for the sake of argument that there is some slight internal inconsistency in terminology, it is resolved by the statute's legislative history and title —— we reject the notion that Congress has not spoken with sufficient clarity to criminalize conduct traditionally the subject of state criminal laws.

Like Marek's, the dissent's lament over the perceived trampling of states' rights misses the mark by the palpable failure to include a crucial observation: Under § 1958, federal authorities have nothing more than <u>concurrent</u> jurisdiction over the subset of murders-for-hire that bear the requisite nexus with interstate commerce. The legislative history plainly states that federal investigation and prosecution should be no more than an "option" to be "used in appropriate cases" to assist state and local authorities, and that "Federal jurisdiction should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved and the relative ability of the Federal and State authorities to investigate and prosecute."[56]

The records in both of these cases eschew any possibility that federal authorities preemptively muscled aside local law enforcement; rather, federal law enforcement was invited by the locals to become involved. Cisneros first was tried and convicted of capital murder in state court. Only after a Texas appellate

---

[56]S. Rep. No. 98-225, at 304-05 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3484.

26

court reversed that conviction for insufficiency of the evidence did the state take the initiative and turn over her case to federal prosecutors.[57]  As for Marek, a county sheriff's deputy tipped to her quest for a mercenary killer referred the case to the Texas Rangers, who in turn referred the case to the FBI.  The two cases before us illustrate the very "[c]ooperation and coordination between Federal and State officials" that Congress intended that § 1958 foster.[58]  The embodiment of such clear legislative intent in providing for concurrent jurisdiction and not preemption must not be overlooked in analogizing the extent of congressional intrusion into spheres of state and local law enforcement.  With all due respect, we believe that the dissent would be well advised to pull back its states' rights argument.  Failure to acknowledge that § 1958 creates <u>concurrent</u> jurisdiction only subjects the dissent's objectivity to question.  For despite its <u>power</u> to preempt this area when regulating commerce, Congress exercised restraint and comity, in the true spirit of Federalism, by creating only <u>concurrent</u> jurisdiction.

## IV.
## CONCLUSION

For the foregoing reasons, we hold that both Cisneros's and Marek's murder-for-hire transactions violated 18 U.S.C. § 1958.

---

[57]<u>Cisneros</u>, 203 F.3d at 339.  In fact, Cisneros charged before her trial in district court that the federal prosecution was "merely a sham or tool for the State of Texas."

[58]S. Rep. No. 98-225, at 305 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 3182, 3484.

27

Cisneros did so by causing her agent to make qualifying telephone calls between the United States and Mexico, thereby using a facility in foreign commerce to facilitate a murder-for-hire. Marek did so by using an interstate commerce facility, Western Union, to wire blood money between Houston and Harlingen, Texas. Satisfied that intrastate use of an interstate commerce facility has satisfied federal jurisdiction under § 1958, there was no error, plain or otherwise, in Marek's conviction or her plea of guilty. We therefore affirm both appellants' convictions and sentences.

AFFIRMED.

E. GRADY JOLLY, Circuit Judge, joined by JONES, SMITH, BARKSDALE, and DeMOSS, Circuit Judges, dissenting:

Because I find that § 1958 requires that the use of the facility be in interstate or foreign commerce, I respectfully dissent.

I

In 1993,[59] the time of these offenses, the relevant part of § 1958 read:

> (a) <u>Whoever</u> travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or <u>uses or causes another</u> (including the

---

[59]In 1994, the statute was amended to allow for capital punishment when death resulted from a murder-for-hire. Pub.L.No. 103-322, § 60003(a)(11), 108 Stat. 1969, 2033 (1994).

intended victim) <u>to use</u> the mail or <u>any facility in interstate or foreign commerce, with intent that a murder be committed</u> in violation of the laws of any State or the United States <u>as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value</u>, shall be fined not more than $10,000 or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined not more than $20,000 and imprisoned for not more than twenty years, or both; and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both.
(b) <u>As used in this section and section 1959</u> . . .
  (2) "<u>facility of interstate commerce</u>" includes means of transportation and communication.

Thus, the issue before us is simply stated: what does the phrase "uses or causes another to use the mail or any facility in interstate or foreign commerce" mean?  Does it mean that the particular use must be in interstate or foreign commerce at the time of the offense, or does it mean that the facility must be one generally engaged in interstate or foreign commerce?  The former is the proper way to read the statute.

A

In our original panel opinion in <u>Cisneros</u>, we began by noting a difference between § 1958(a) and § 1958(b).  Part (a) refers to facilities "*in* interstate or foreign commerce," while (b) mentions facilities "*of* interstate commerce."  At that time, we were not sure how to treat part (b).  It appeared to be purely definitional, but it purported to define a term, "facility *of* interstate commerce," that was not present in (a).  In truth, "of interstate commerce"

means something very different from "in interstate commerce."  Thus, we concluded that (b) was in conflict with (a), and proceeded with our analysis to resolve that conflict.[60]

We all now appear to agree, however, that (b) is not definitional in the sense that the Cisneros panel construed it.  Instead, (b) merely provides examples of what might constitute a "facility" for purposes of the statute--means of transportation and communication.  Read in this way, (b) does not conflict with (a), as it does not define a term not present in (a).

B

We will therefore focus on part (a) and ask what "use a facility in interstate or foreign commerce" means.  The threshold question is whether the phrase "in interstate or foreign commerce" describes the word "use" or the word "facility."  If the phrase modifies use, then the statute clearly requires that the particular use be "in interstate or foreign commerce."  We believe this is the proper construction.

---

[60]We ended up ignoring (b) altogether.  We acknowledged that the canon against superfluousness counselled against doing this.  But this canon cut both ways, because replacing "in" in (a) with "of" would have rendered the part of (a) related to travel superfluous.  Interstate travel would always require use of a facility of interstate commerce.  At least by ignoring (b) rather than part of (a), however, we were giving precedence to the operational, as opposed to the definitional, part of the statute.  See United States v. Weathers, 169 F.3d 336, 342 (6th Cir. 1999).

The majority first contends that because "in interstate or foreign commerce" falls next to "facility," that is the term the phrase modifies.  But consider how the statute would have read if the drafters did intend the meaning we propose and had followed the majority's "rule of proximity": "whoever causes another to use, in interstate or foreign commerce, the mail or any facility."  This arrangement of words is an awkward grammatical construction that Congress was unlikely to accept. This is true, not only because the construction is awkward, but because it would require the use of the United States mail to be in interstate or foreign commerce before federal jurisdiction would attach.[61]  Thus, the rule of proximity does not appear helpful here.

The majority also considers § 1958's title, "Use of interstate commerce facilities in the commission of murder-for-hire."  According to the majority, this suggests that the "in interstate or foreign commerce" clause modifies "facilities."  But this title is cursory and intended only as a quick, general description.  The title is so inconsistent with the statute that it omits any reference to "foreign facilities."  Does that mean that use of facilities in foreign commerce really does not qualify under the statute?  No, of course not.  The title of a statute is of little

_____

[61]This would be a different conclusion from the one we reached in United States v. Heacock, 31 F.3d 249, 254-55 (5th Cir. 1994), with respect to the Travel Act, § 1952.

help when ascertaining the statute's meaning requires untangling subtleties.

Instead, we return to the phrase in question: "Whoever <u>travels</u> <u>in</u> interstate or foreign commerce, or <u>uses</u> the mail or any facility <u>in</u> interstate or foreign commerce." Because the phrase "in interstate or foreign commerce" is used more than once, it is appropriate to look at the other uses of the term and to interpret them in a consistent manner. In the first part of the statute ("[w]hoever travels in . . . interstate or foreign commerce"), the phrase "in interstate or foreign commerce" is used as an adverbial clause that modifies the verb "travels." The "in" clause tells us where the travel occurred. The second use of the phrase reads: "or uses or causes another to use . . . any facility in interstate or foreign commerce." If the "in" clause is used in a consistent manner in the statute, this second use is an adverbial clause as well, telling us where that use must occur, that is, "in interstate or foreign commerce."

Thus, relating "in interstate or foreign commerce" to "use" appears to be the proper way to read the statute. But even if one does not agree with this reasoning, one must concede that, at a minimum, the statute is ambiguous as to which words "in interstate or foreign commerce" modifies.

If we then turn to the alternative, that the "in interstate or foreign commerce" clause modifies "facility," it creates greater

ambiguity.   There are two possible interpretations of that grammatical construction: either any facility that is *generally engaged* "in" interstate or foreign commerce will qualify, or the facility must be "in" interstate or foreign commerce at the moment of the offense.   If, however, we chose the first, we would be interpreting "in interstate or foreign commerce" as though Congress had said "of interstate or foreign commerce."  Any facility that is *generally engaged* "*in* interstate or foreign commerce" is, by definition, a facility "*of* interstate or foreign commerce."  But the phrase "facility of interstate or foreign commerce" evokes something different from "facility in interstate or foreign commerce."[62]  This very significant distinction weighs against the first interpretation and suggests instead that the facility should be in interstate or foreign commerce at the time of the offense.  At the very minimum, there is ambiguity in the statute.

If one concedes the  statute's ambiguity, the next place to turn is the canons of construction.  One is particularly apt: when facing a statute that could potentially alter the delicate balance between the state and federal government, especially in the area of

---

[62]If the dictionary definitions of the two words is not enough, consider the Supreme Court's discussion of Congress' interstate commerce powers under <u>United States v. Lopez</u>, 514 U.S. 549, 558-59 (1995).  The Court clearly differentiated between "*in* interstate commerce" and "*of* interstate commerce": "the instrumentalities of interstate commerce, or persons or things in interstate commerce."

criminal law, we require an unmistakably clear statement by Congress that this was its intent. <u>Gregory v. Ashcroft</u>, 501 U.S. 452, 460, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991); <u>Atascadero State Hospital v. Scanlon</u>, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); <u>United States v. Rewis</u>, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1071); <u>United States v. Bass</u>, 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).  The construction the majority proposes would alter this balance significantly.  The majority's interpretation would make virtually every murder-for-hire a federal crime, because any use of a telephone or an automobile would qualify.[63]  It is difficult to

---

[63]This expansion of federal power stems from the majority's broad interpretation of "in interstate or foreign commerce" to be synonymous with the phrase "of interstate or foreign commerce." Because § 1958(b)(2) specifies that "means of transportation and communication" are facilities <u>of</u> interstate commerce for purposes of the statute, any use of a telephone or automobile would be sufficient to invoke the statute.  Moreover, courts typically treat the similar term "instrumentality of interstate commerce" as encompassing "means of transportation and communication" like cars and telephones.  <u>See</u> <u>United States v. Gilbert</u>, 1999 WL 397424 at *6 (1st Cir. 1999)(holding that a telephone is an instrumentality of interstate commerce, regardless of whether it is used in an interstate manner); <u>United States v. Weathers</u>, 169 F.3d 336, 341 (6th Cir. 1999)(intrastate telephone calls qualify as use of instrumentality of interstate commerce); <u>United States v. Cobb</u>, 144 F.3d 319, 322 (4th Cir. 1998)(automobiles qualify as instrumentalities of interstate commerce); <u>United States v. Randolph</u>, 93 F.3d 656, 660 (9th Cir. 1996)("[C]ars are themselves instrumentalities of interstate commerce."); <u>United States v. Bishop</u>, 66 F.3d 569, 588 (3d Cir. 1995)(motor vehicles are instrumentalities of interstate commerce); <u>Dupuy v. Dupuy</u>, 511 F.2d 641, 644-45 (5th Cir. 1975)(holding that intrastate use of phones qualifies as use of an instrumentality of interstate commerce).

Of course, these cases all refer to "instrumentalities," not

imagine a murder-for-hire scheme that would not involve the use of a phone or a car at some point.  But nothing in the language of the statute suggests that Congress intended to make all such crimes a matter of federal concern.  Thus, this canon weighs heavily against the majority's interpretation.

Moving on from parsing the language and construction of the statute, the majority also refers to <u>United States v. Heacock</u>, 31 F.3d 249, 254-55 (5th Cir. 1994) for support of its position.  In that case, we construed § 1958's companion statute, the Travel Act, to encompass purely intrastate use of the mails.  And, as the majority notes, we have previously used jurisprudence interpreting the Travel Act as a guide in construing § 1958.

<u>Heacock</u> is not, however, helpful in the inquiry before us. First, the language in the Travel Act at the time was different from that before us in § 1958: "whoever . . . uses any facility in interstate or foreign commerce, including the mail."  Any conclusions about the meaning of those words are of questionable value in construing the meaning of a different set and arrangement of words.  Second, we based our <u>Heacock</u> decision on the reasoning applied in <u>United States v. Riccardelli</u>, 794 F.2d 829, 831-33 (2d Cir. 1986).  In that case, the court concluded that the mails were

_____

"facilities."  As we explained in our original <u>Cisneros</u> opinion, however, the important distinction is between the use of "of" and "in," not between "instrumentality" and "facility." <u>Cisneros</u>, 194 F.3d at 632, n.4.

a special case, separate and distinct from "facilities in interstate or foreign commerce."  The historical and constitutional pedigree of the postal service indicates that this entity is inherently federal in nature, and that Congress has special concern in regulating its use.  Thus, *any* use of the mail qualified under the statute.  But <u>Heacock</u> does not, therefore, extend to any intrastate use of other facilities for purposes of § 1958.

Neither is the legislative history supportive of the majority's reading of the statute.  Although the majority points to passages from a report by the Senate Judiciary Committee for the proposition that Congress intended to extend federal authority under § 1958 to almost all murders-for-hire, limited only by the prosecutor's discretion, it omits passages clearly supportive of a congressional intent to limit jurisdiction to cases in which a facility is in interstate or foreign commerce at the time of the offense.  For instance, the report's example of a situation in which the federal nexus is present plainly contemplates the use of a  facility in interstate commerce:  "Thus, an *interstate* telephone call is sufficient to trigger federal jurisdiction." S. Rep. No. 225, 98th Cong., 1st Sess. 1983, 1984 U.S.C.C.A.N. 3182, 3485.  The report does not assert that any use of a telephone is sufficient.  Instead, it suggests that the actual use must be in interstate or foreign commerce.  Similarly, in describing the prosecutorial discretion

involved, the report notes that "the committee fully appreciates that many state and local police forces and prosecutors offices are quite capable of handling a murder for hire case notwithstanding *the presence of some interstate aspects* . . ." Id. at 3484.  This passage suggests that Congress envisioned that all of the cases falling under the statute would have some "interstate aspects," and not just local use of the facilities <u>of</u> interstate commerce. Admittedly, the report does use both the language "facility <u>of</u> interstate commerce" and "facility <u>in</u> interstate commerce." This alternative use in a legislative report cannot conclusively establish Congress' intent in drafting the statute.  Ultimately, as is often the case, the legislative history is inconclusive, and thus unreliable.

All of the ambiguity we have outlined in this dissent leads us to the same conclusion reached in the original <u>Cisneros</u> opinion-- that the rule of lenity is applicable to this case.  The rule applies when, after "seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended."  <u>United States v. Wells</u>, 519 U.S. 482, 499, 117 S.Ct. 921, 931, 137 L.Ed.2d 107 (1997)(quoting <u>Smith v. United States</u>, 508 U.S. 223, 239, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993), and <u>Ladner v. United States</u>, 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958)).  We believe this is the situation here.

The rule of lenity counsels us to resolve ambiguity in criminal statutes by construing such statutes narrowly.  This rule is rooted in the due process requirement that Congress clearly articulate what conduct it has made criminal:

> '(W)hen choice has to be made between two readings of what conduct has made Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.  We should not derive criminal outlawry from some ambiguous implication.' . . . This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.

Ladner v. United States, 358 U.S. 169, 178 , 79 S.Ct. 209, 214, 3 L.Ed.2d 199 (1958) (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-22, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952)).  In our case, the rule weighs in favor of requiring that the use of the facility be in interstate or foreign commerce.

The majority has reached a different conclusion.  In doing so, they split from the Sixth Circuit.  United States v. Weathers, 169 F.3d 336, 342 (6th Cir. 1999).  I respectfully dissent.